# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH EMAIL<br>ACCOUNTS THAT ARE STORED AT PREMISES<br>CONTROLLED BY MICROSOFT | )<br>)<br>)<br>)<br>)<br>) Case No. MJ20-165 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2, incorporated herein by reference.

located in the Western District of Washington , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-2, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Murder for Hire |

The application is based on these facts:

✓ See Affidavit of Allana Kleinosky, continued on the attached sheet.

☐ Delayed notice of days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or ☐ telephonically recorded.

*Applicant's signature*

Allana Kleinosky, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: 4/10/20

*Judge's signature*

City and state: Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

STATE OF WASHINGTON    )
                       )    ss
COUNTY OF KING         )

I, Allana Kleinosky, having been duly sworn, state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since May 2019.  I am currently assigned to the violent crime, gang, and transnational organized crime squad in the Seattle, Washington office.  As an FBI Special Agent, I have been trained to investigate a variety of crimes, including cases involving federal criminal violations related to violent crimes, illegal drug sales and distribution, gang related criminal activities, and special jurisdiction matters. In this capacity, I investigate, *inter alia,* violations of Title 18 and 21 of the United States Code.

2.      Prior to my role as a Special Agent for the FBI, I was an Air Marshal with the Federal Air Marshal Service for three years and a Customs and Border Protection Officer with Customs and Border Protection for three and a half years.  During my time as a Customs and Border Protection Officer and Federal Air Marshal, I participated in several arrests, seizures, and other law enforcement actions.  I have conducted hundreds of interviews, have taken law enforcement action, and made law enforcement determinations based on the facts I gathered from these interviews.

3.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google LLC ("Google"), located at 1600 Amphitheater Parkway in Mountain View, California, Microsoft Corporation ("Microsoft"), located at 1 Microsoft Way in Redmond, Washington, and Facebook, Inc. ("Facebook"), located at 1601 Willow Road, Menlo Park, California (collectively, **THE PROVIDERS**").  The information to be searched is described in the following paragraphs and in Attachments A-1, A-2, and A-3.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 1
USAO# 2020R00187

4.     This affidavit is made in support of an application for a search warrant pursuant to Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require **THE PROVIDERS** to disclose to the government copies of the information, including the content of communications, further described in Section I of Attachments B-1, B-2, and B-3, pertaining to the following accounts:

      a.  jackemerson@outlook.com ("**SUBJECT ACCOUNT 1**")

      b.  jonasmccoy@gmail.com ("**SUBJECT ACCOUNT 2**")

      c.  lluviafigueroa22@hotmail.com ("**SUBJECT ACCOUNT 3**")

      d.  lfigueroa@my.ghc.edu ("**SUBJECT ACCOUNT 4**")

      e.  kendranewman22@outlook.com ("**SUBJECT ACCOUNT 5**")

      f.  nicolestigall22@outlook.com ("**SUBJECT ACCOUNT 6**")

      g.  lluviaselene.sierrafigueroa (Facebook ID 100002531010182) ("**SUBJECT ACCOUNT 7**")

      h.  katlyn.everson.5 ("**SUBJECT ACCOUNT 8**")

      i.  cmarison (Facebook ID 28501000) ("**SUBJECT ACCOUNT 9**")

(hereinafter, collectively the "**SUBJECT ACCOUNTS**").  Upon receipt of the information described in Section I of Attachments B-1, B-2, and B-3, government-authorized persons will review that information to locate the items described in Section II of Attachments B-1, B-2, and B-3.  This warrant is requested in connection with an ongoing investigation in this district by the FBI.

5.     The facts set forth in this Affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; review of documents and records related to this investigation; communications with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  Because this Affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 2
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1 set forth each and every fact that I or others have learned during the course of this
2 investigation.

3      6.     Based on my training and experience and the facts as set forth in this
4 affidavit, there is probable cause to believe that violations of Title 18, United States
5 Code, Sections 1958 (Murder for Hire) have been committed by LLUVIA FIGUEROA.
6 Section 1958 prohibits "us[ing] or caus[ing] another . . . to use . . . any facility of
7 interstate or foreign commerce, with intent that a murder be committed in violation of the
8 laws of any State or the United States as consideration for the receipt of, or as
9 consideration for a promise or agreement to pay, anything of pecuniary value" or
10 conspiring to do the same.  There is also probable cause to search the information
11 described in Attachments A-1, A-2, and A-3, for evidence, instrumentalities, or
12 contraband of these crimes, as described in Attachments B-1, B-2, and B-3.

13     **7.**     This warrant application is to be presented electronically pursuant to Local
14 Criminal Rule CrR 41(d)(3).

15 **BACKGROUND ON CRYPTOCURRENCY**

16     8.     Cryptocurrency, a type of virtual currency, is a decentralized, peer-to-peer,
17 network-based medium of value or exchange that may be used as a substitute for fiat
18 currency to buy goods or services or exchanged for fiat currency or other
19 cryptocurrencies.  Cryptocurrency can exist digitally on the Internet, in an electronic
20 storage device, or in cloud-based servers.  Although not usually stored in any physical
21 form, public and private keys (described below) used to transfer cryptocurrency from one
22 person or place to another can be printed or written on a piece of paper or other tangible
23 object.  Cryptocurrency can be exchanged directly person to person, through a
24 cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is
25 not issued by any government, bank, or company; it is instead generated and controlled
26 through computer software operating on a decentralized peer-to-peer network.  Most
27 cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 3
USAO# 2020R00187

1  decentralized network, containing an immutable and historical record of every

2  transaction.[1]   Cryptocurrency is not illegal in the United States.

3        9.      Bitcoin[2] is a type of cryptocurrency.  Payments or transfers of value made

4  with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any

5  single administrator or entity.  As mentioned above, individuals can acquire bitcoins

6  through exchanges (i.e., online companies which allow individuals to purchase or sell

7  cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin

8  ATMs, or directly from other people.  Individuals can also acquire cryptocurrencies by

9  "mining."  An individual can "mine" bitcoins by using his/her computing power to solve

10  a complicated algorithm and verify and record payments on the blockchain.  Individuals

11  are rewarded for this task by receiving newly created units of a cryptocurrency.

12  Individuals can send and receive cryptocurrencies online using many types of electronic

13  devices, including laptop computers and smart phones.

14        10.     Even though the public addresses of those engaging in cryptocurrency

15  transactions are recorded on a blockchain, the identities of the individuals or entities

16  behind the public addresses are not recorded on these public ledgers.  If, however, an

17  individual or entity is linked to a public address, it may be possible to determine what

18  transactions were conducted by that individual or entity.  Bitcoin transactions are

19  therefore sometimes described as "pseudonymous," meaning that they are partially

20  anonymous.  And while it is not completely anonymous, Bitcoin allows users to transfer

21  funds more anonymously than would be possible through traditional banking and credit

22  systems.

23

24  _____

25  [1] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to
26  obfuscate transactions, making it difficult to trace or attribute transactions.
    [2] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice
27  is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and
    community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the
28  cryptocurrency.  That practice is adopted here.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 4
USAO# 2020R00187

11.     Cryptocurrency is stored in a virtual account called a wallet.  Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency.  A public key (or public address) is akin to a bank account number, and a private key (or private address) is akin to a Personal Identification Number ("PIN") number or password that allows a user the ability to access and transfer value associated with the public address or key.  To conduct transactions on a blockchain, an individual must use the public key and the private key.  A public address is represented as a case-sensitive string of letters and numbers.  Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address.  Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

12.     Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network.  By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

13.     Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including: on a tangible, external device ("hardware wallet"); downloaded on a Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud storage provider ("online wallet"); as a mobile application on a smartphone or tablet ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of external or removable media device, such as a Universal Serial Bus ("USB") thumb
2  drive or other commercially available device designed to store cryptocurrency (e.g.
3  Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address
4  and a QR code[3] with the public and private key embedded in the code.   Paper wallet keys
5  are not stored digitally.  Wallets can also be backed up into, for example, paper printouts,
6  USB drives, or CDs, and accessed through a "recovery seed" (random words strung
7  together in a phrase) or a complex password.  Additional security safeguards for
8  cryptocurrency wallets can include two-factor authorization (such as a password and a
9  phrase).

10  ## BACKGROUND CONCERNING THE DARK NET

11        14.   The "dark net" or "dark web" is a portion of the "Deep Web" of the
12  Internet, where individuals must use anonymizing software or applications to access
13  content and websites.  Within the dark web, criminal marketplaces operate, allowing
14  individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous
15  materials, with greater anonymity than is possible on the traditional Internet (sometimes
16  called the "clear web" or simply the "web").  These online market websites use a variety
17  of technologies, including the Tor network (defined below) and other encryption
18  technologies, to ensure that communications and transactions are shielded from
19  interception and monitoring.  Famous dark web marketplaces, also called Hidden
20  Services, such as Silk Road, AlphaBay,[4] and Dream Market[5] operated similarly to clear
21  web commercial websites such as Amazon and eBay, but offered illicit goods and
22  services.  There are a number of marketplaces that have appeared on the dark web that
23
24

---

25  [3] A QR code is a matrix barcode that is a machine-readable optical label.
26  [4] AlphaBay was a website on the dark web that offered drugs and other contraband for sale.
   Furthermore, I know that AlphaBay was seized by U.S. law enforcement in July 2017.
27  [5] Dream Market was a website on the dark web that offered drugs and other contraband for sale.
28  In late March 2019, Dream Market announced it was closing on April 30, 2019 and transferring
   its services to a partner company.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 6
USAO# 2020R00187

1  have offered contraband for sale, including narcotics.  Users typically purchase narcotics
2  through these marketplaces using digital currency such as bitcoin.

3      15.    "Vendors" are the dark web's sellers of goods and services, often of an
4  illicit nature, and they do so through the creation and operation of "vendor accounts" on
5  dark web marketplaces.  Customers, meanwhile, operate "customer accounts."  Vendor
6  and customer accounts are not identified by numbers, but rather monikers or "handles,"
7  much like the username one would use on a clear web site.  If a moniker on a particular
8  marketplace has not already been registered by another user, vendors and customers can
9  use the same moniker across multiple marketplaces.  Based on customer reviews, vendors
10 can become well known as "trusted" vendors.

11     16.    The Onion Router or "Tor" network is a special network of computers on
12 the Internet, distributed around the world, that is designed to conceal the true Internet
13 Protocol ("IP") addresses of the computers accessing the network, and thereby the
14 locations and identities of the network's users.  Tor likewise enables websites to operate
15 on the network in a way that conceals the true IP addresses of the computer servers
16 hosting the websites, which are referred to as "hidden services" on the Tor network.
17 Such "hidden services" operating on Tor have complex web addresses, which are many
18 times generated by a computer algorithm, ending in ".onion" and can only be accessed
19 through specific web browser software designed to access the Tor network.  Most
20 "hidden services" are considered dark web services with no legitimate or identified
21 service provider to which legal process may be served.

22                    **STATEMENT OF PROBABLE CAUSE**
23 **A.    Summary of Investigation**

24     17.    On February 12, 2020, the FBI received an anonymous tip from an
25 individual ("SOI-1") purporting to operate a website on the dark web that offers hitmen
26 for hire.  SOI-1 claimed to have received a request to murder a woman who resides in
27 Bellevue, Washington ("VICTIM").  SOI-1 stated that, although SOI-1's website offers
28

to murder individuals in exchange for Bitcoin, the website is a scam, designed to steal money from customers.

18.     As described herein, the FBI has determined that, around the time of the murder for hire, VICTIM's husband, J.M., had been having an extramarital affair with LLUVIA FIGUEROA, a college student whom he met at a self-help course.  When the FBI interviewed FIGUEROA, she admitted that she paid an unknown person, located on the dark web, to kill VICTIM in exchange for $5,000 in bitcoin.

19.     As described in further detail below, FIGUEROA and J.M. used the **SUBJECT ACCOUNTS** to communicate with one another during the course of the affair, and FIGUEROA used the **SUBJECT ACCOUNTS** to attempt to anonymously communicate with the VICTIM, purchase bitcoin, and solicit the murder.

**B.     Anonymous Tip**

20.     On February 12, 2020, a complainant, SOI-1, submitted an online tip to the FBI National Threat Operations Center.  The tip was anonymous, sent from a ProtonMail account, using an IP address associated with a Virtual Private Network ("VPN")[6] in Phoenix, Arizona.  Based on my training and experience, and information gained during the course of this investigation, I know that individuals often use VPNs and encrypted email providers like ProtonMail in order to conceal their identities or physical locations online.

21.     In this tip, SOI-1 claimed to have information regarding a murder for hire. SOI-1 claimed to be the administrator of a "dark web site that offers hitmen for hire," and explained that he/she was contracted to kill VICTIM for approximately $5,000, paid in

---

[6] A VPN connection is a means of connecting to a private network over a public network such as the Internet. A VPN is created by establishing a virtual point-to-point connection through the use of dedicated connections, virtual tunneling protocols, or traffic encryption. VPNs are also frequently used by people who wish to circumvent geographic IP limitations and censorship, and to connect to proxy servers for the purpose of obfuscating the source of an internet connection or transmission.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 8
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  bitcoin.[7]  SOI-1 claimed the website was set up to scam people out of money, and that no

2  actual murders were committed by SOI-1 or anyone working on SOI-1's behalf.

3      22.  SOI-1 explained that he/she was concerned about receiving the request to

4  murder VICTIM, thinking that if someone was willing to pay SOI-1, that person may find

5  other means to kill VICTIM.  SOI-1 wanted to work with the FBI and police to track

6  down the individual who had solicited the murder.  SOI-1 stated "I feel that all targets

7  that have been paid for are in danger.  Customers that pay to kill someone show that they

8  are serious about killing that person[.]  I need to be in contact with you and to provide

9  you with the target information, payments evidence, and other information to trace the

10 customers.  Customers don't give their name or details and hide their IP, but still can be

11 tracked."  SOI-1 provided information related to VICTIM and another contract, and said

12 he/she would be willing to provide more details on additional targets.

13     23.  SOI-1 said that when he/she had received a request to murder VICTIM, the

14 solicitor of this murder (hereinafter referred to as the "solicitor") provided SOI-1 with

15 VICTIM's address in Bellevue, Washington, the name of her employer, the city where

16 she was employed, the age of her son, her routine regarding child care, and the time she

17 returns home.  The solicitor told SOI-1:

> Just kill her ASAP.  I don't care how just make sure she's dead.  I'd prefer
> if you shoot her in the head.  She works in [corporation][8] in Bellevue but I
> don't know where exactly.  I don't know if that helps you in someway.  She
> has a 3 years old son that she picks him up at 5 P.M. so she usually gets
> home around 5ish.  Please don't do anything to the boy.  That's all.
> Thanks[.]  Send me a proof when the job's done.

    24.  SOI-1 also provided a picture of VICTIM, which an FBI Special
Agent Caryn Highley recognized as VICTIM, having met her in person.

---

[7] SOI-1 also informed the FBI about a second murder that had been solicited on SOI-1's website
unrelated to the VICTIM identified in this Affidavit.  The FBI is also investigating that potential
hit.
[8] This information is redacted to protect VICTIM's privacy and safety.  However, I have
determined that the corporation listed as VICTIM's employer is, in fact, accurate.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 9
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Additionally, SOI-1 provided the Bitcoin wallet address used for the transaction, which Agent Highley confirmed on the publicly accessible blockchain received approximately .53 bitcoin on February 4, 2020.  Based on the value of Bitcoin on that particular date, this amount is roughly equivalent to the amount that SOI-1 claimed he/she was paid by the solicitor—$5,000.

**C.    Interview of VICTIM**

25.    On February 13, 2020, Agent Highley, along with others, interviewed VICTIM and advised her of the solicitation of her murder.  In order to identify who might have wanted to have VICTIM killed, law enforcement asked VICTIM to identify those who might have wished her harm.

26.    VICTIM explained that, in 2010, her husband, J.M., was involved in a sexual harassment lawsuit.  J.M. alleged that a former employer had harassed him, which led to J.M. leaving his company and suing his former boss.  VICTIM felt that it was unlikely that J.M.'s former employer would solicit her murder, but said it was possible due to the "life altering" nature of the situation.

27.    VICTIM explained that her husband, J.M., was involved in another lawsuit after he left his former employer in October 2019 to form a business.  After starting this business, J.M.'s former employer sued J.M. for violation of a non-compete clause.  The lawsuit remains ongoing and, in November or December 2019, VICTIM paid their lawyers $5,000 for legal services from a joint account held by J.M. and VICTIM.  Recently, a second payment of $5,000 had been withdrawn from her husband's business account.  VICTIM's husband had informed her that this second payment had been made to their lawyers, since she did not have access to her husband's business account.

28.    VICTIM also stated that, on December 23, 2019, an unknown female rang VICTIM's front doorbell and asked for J.M. by name.  VICTIM's Ring camera captured the interaction.  When VICTIM told the female that J.M. was not home, the female said she was there to see VICTIM and asked to come into the house.  VICTIM became concerned because the female kept reaching into her pockets.  The female's behavior and

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 10
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  her desire to enter the residence prompted VICTIM to lock the deadbolt while talking to

2  the unknown female through the door.  J.M. was not home, but utilizing the Ring camera,

3  he joined the conversation.  Shortly afterward, the female walked away.  VICTIM called

4  911 and reported the incident to Bellevue Police Department.  She also provided a copy

5  of the video to Bellevue Police Department.  VICTIM still had the video footage

6  available.  Agent Highley reviewed that video and, due to the image quality, cannot

7  conclusively say the female is FIGUEROA, however, based on the complexion, stature,

8  and voice, the woman in the image appears to resemble FIGUEROA.[9]  At the time,

9  VICTIM did not believe the female knew them.  The female asked for J.M. by name, but

10 there was a package outside the residence, next to the front door that was from a family

11 member.  The package had J.M.'s full name visible on it, printed in large letters.  When

12 the female claimed to be there to see VICTIM, she referred to VICTIM as "you" and

13 never referred to her by name.

14      29.    VICTIM also explained that, at the end of January 2020, her employer

15 prematurely ended a contract with a Phoenix-based company.  The contract concluded

16 due to work performance issues with this company.  VICTIM communicated with an

17 employee of this company, B.O., regularly.  According to VICTIM, B.O. is familiar with

18 VICTIM's daily routine, including the time she leaves work to pick up her son.  On one

19 occasion, B.O. traveled to Bellevue, Washington, for two weeks to work at VICTIM's

20 employer's office.  B.O. and VICTIM had several arguments due to criticism of B.O.'s

21 work performance by VICTIM and her supervisor.  B.O. has never threatened VICTIM

22 or any other employees.  Despite their turbulent relationship, VICTIM stated she would

23 be surprised if B.O. had tried to harm her.  VICTIM last spoke to B.O. on February 12,

24 2020.  She said it was difficult to get a hold of B.O., and when she was finally able to

25 contact B.O. on the 12th, B.O. was evasive and quickly ended the phone call.

26

27

28
[9] As explained below, J.M. later explained that he recognized this person to be FIGUEROA and
FIGUEROA admitted, during a proffer interview, that she was the person on camera.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

30.     When asked about her relationship with her husband, J.M., VICTIM said it had been strained for the last few years.  She described it as a "loss of passion" and in 2018, VICTIM said her husband asked her for a divorce.  She described their relationship as growing distant, turning into more of a friendship than a marriage.  She said this began after her husband went to a Landmark conference.  She described the conference as a self-help group designed to help people reassess their lives and make drastic changes. When her husband brought up divorce, VICTIM told her husband that she didn't want to get a divorce.  She wanted to remain a family for the sake of their son.  She convinced her husband to participate in counseling.  However, due to J.M.'s work schedule, he was unable to attend in-person counseling but agreed to an online counseling program. VICTIM stated she had not had an extramarital affair and did not believe her husband had either.

31.     VICTIM described her and J.M.'s financial situation as strained, due to the new business and the current lawsuit.  She described their financial situation as month-to-month.  VICTIM stated that she and J.M. each have a $1.5 million life insurance policy. In December 2019, J.M. began asking her to increase their life insurance policies by five hundred thousand dollars each.  VICTIM did not want to meet with an insurance salesman but J.M. continued to bring it up.

**D.     Interview with J.M.**

32.     On February 13, 2020, Agent Highley, along with others, interviewed J.M. When informed about the threat, he discussed the current lawsuit involving the non-compete clause.  However, he stated it was unlikely that his prior employer would make threats against him or his wife.  When discussing the details contained in the threat, provided by SOI-1, he said the timeframe listed for VICTIM coming home was incorrect, as VICTIM usually comes home at a later time of night.

33.     J.M. asked about VICTIM's work with the Phoenix-based company, noting that "they would be closing that team."  He explained that VICTIM had issues with the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   manager of the Phoenix team (believed to be B.O.) and described the Phoenix manager as

2   "snippy" and "aggressive."

3       34.    When describing his job, J.M. stated that he has "great relationships with

4   people at work," his clients "love" him, he "just had a big win" earlier in the day, and

5   does not believe he makes enemies.  He stated the "only major points of serious

6   contention are that lawsuit against me and that thing out in Phoenix."

7       35.    When asked if anything unusual had occurred recently, J.M. described the

8   incident from December 23, 2019.  VICTIM notified him that someone was at the door

9   asking for him and said that an unknown female asked to enter the residence.  He

10  confronted the female through the Ring camera, and was able to pull up video to see what

11  she looked like.  J.M. said the female appeared to be older and seemed to be hiding her

12  face.  He was unsure of the date but he believed it was after Christmas.  The unknown

13  female named him, but not his wife.  There was a package outside of the residence that he

14  described as having his name on it, written in large font.  The unknown female reminded

15  him of an employee at his former job—the employer involved in the non-compete

16  lawsuit—but said that this employee had been living in Pennsylvania for the last two

17  years.  He did not recognize her voice, he described it as having an accent, was unsure of

18  the region, and only described it as an "American" accent.[10]  The only other unusual

19  event he could recall was an attempted "break-in" at their residence approximately two

20  years ago.

21      36.    When asked about the possibility of the suspect being someone he had a

22  relationship with, J.M. discussed the Landmark personal development course.  J.M.

23  explained that he first took a course in 2018, attended a second course in 2019, and began

24  attending the third course near the end of 2019.  Due to the length of the third course, he

25  dropped out at the request of his wife because there was too much going on at home.

26

27  _____

28  [10] As described below, J.M. later recanted this explanation and told the FBI that he knew this woman was
    FIGUEROA.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 13                    UNITED STATES ATTORNEY
USAO# 2020R00187                                           700 STEWART STREET, SUITE 5220
                                                          SEATTLE, WASHINGTON 98101
                                                               (206) 553-7970

J.M. stated that he provided personal information in group discussions, but never discussed information regarding his or his wife's schedule.  He said he discussed issues about his marriage with people in the group, but also indicated he wanted to repair the marriage.  J.M. said he shared the information regarding his wife with a woman, but he could not remember who she was.  J.M. said he couldn't imagine that she would "instigate" the current situation.  He stated that he didn't have any "follows" or anyone he described as a "secret valentines in there or anything.  You know what I mean?  That I knew."

37.     During the interview, J.M. initially denied having an extramarital affair.  As the conversation continued, J.M. said there was "someone" at the Landmark program that "really liked" him.  He stated her name was LLUVIA.  When asked for her last name, J.M. accessed his cell phone, and he stated he last had contact with her on January 25, 2020, when she sent him a paper for him "to correct for school."  J.M. explained that LLUVIA is a student somewhere in South Bend, studying immigration law.  Later during the interview, J.M. accessed LLUVIA FIGUEROA's Facebook account and mentioned that she was attending school at Grays Harbor College.  J.M. stated that FIGUEROA sent the paper to him on January 25, 2020, from her email address lluviafigueroa22@hotmail.com (**SUBJECT ACCOUNT 3**).  He claimed the last time FIGUEROA had been in his house was June 2019.

38.     As the conversation continued, J.M. admitted to having a sexual relationship with FIGUEROA that lasted approximately "six months or so, a couple times, here and there."  According to J.M., the relationship started as a friendship in 2018 when they met at the Landmark course and later became romantic.  He claimed the romantic relationship ended in August 2019.  J.M. said he last saw FIGUEROA in January of 2020, when she told him she still loved him.

39.     J.M. explained that, while he knew FIGUEROA, he provided her with money on multiple occasions to "help her out."  Most recently, on January 3, 2020, FIGUEROA asked J.M. for $5,000.  J.M. said that he didn't have that amount of money

1  and instead gave her $2,000.  FIGUEROA said that the money was to help her parents
2  because they were victims of a break-in and lost their life savings.  While all of the
3  previous payments were sent through Facebook, the $2,000 payment was made through
4  J.M.'s PayPal account.

5      40.      When the situation in Phoenix was brought up again, J.M. stated, "No, I
6  don't think that, I mean, if anything it's this [his relationship with FIGUEROA], this is
7  much more probabl[e] than that."  When asked why he felt that way, J.M. stated it was
8  because, "[FIGUEROA] likes me and I said, I'm not gonna do that anymore…"
9  However, J.M. clarified that FIGUEROA gave him no indication of being a threat.

10  **E.      Interview of FIGUEROA**

11      41.      On February 14, 2020, FBI Special Agent Schroff interviewed LLUVIA
12  FIGUEROA[11] at her place of employment in Aberdeen, Washington.  Prior to the
13  interview, Agent Schroff identified himself with his FBI credentials and asked
14  FIGUEROA if she would be willing to speak with him in a private place.  Agent Schroff
15  informed FIGUEROA that she wasn't in trouble but may be a witness.  FIGUEROA
16  agreed and suggested the two meet outside as there were no quiet semi-private areas
17  inside the business.  Due to the temperature outside, Agent Schroff suggested the two
18  speak in his vehicle and asked FIGUEROA if she would be comfortable with that.
19  FIGUEROA agreed and the two spoke in the vehicle, with FIGUEROA sitting in the
20  passenger seat of the unlocked car.  Towards the end of the interview, Agent Schroff
21  explicitly told FIGUEROA that she was not under arrest and would be going back to
22  work that night.

23      42.      FIGUEROA told Agent Schroff that she participated in the Landmark
24  program, along with her brother, and met J.M. there.  They became friends, and their
25  friendship evolved into a sexual relationship that has continued.  FIGUEROA said that
26  she had been in J.M.'s house five to seven times, including once with her brother.

27  _____

28  [11] This interview was recorded surreptitiously.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 15
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  FIGUEROA explained that she last saw J.M. approximately three weeks ago when they
2  went to Portland, Oregon, where they spent the night.

3       43.    FIGUEROA claimed that, at first, she was unaware that J.M. was married.
4  When she found out, J.M. told FIGUEROA that his wife had cancer and that he talked to
5  his wife about divorce but decided to stay with her due to her illness. FIGUEROA stated
6  the situation made her angry. FIGUEROA initially denied hiring someone to hurt J.M.'s
7  wife.

8       44.    Agent Schroff asked FIGUEROA for further details about J.M.
9  FIGUEROA explained that, even though she knew J.M. for approximately two years, she
10 did not believe she knew him completely. When asked why she felt that way,
11 FIGUEROA stated that J.M. would say things that were not accurate. For example,
12 FIGUEROA said that J.M. told her that his wife was sick, and that he could not stand his
13 wife. However, FIGUEROA observed photos online of J.M. and his wife that appeared
14 to contradict those statements. Additionally, when J.M. and FIGUEROA went to Oregon
15 together, J.M. told FIGUEROA that his wife went to Malaysia to get surgery.
16 FIGUEROA learned that VICTIM took her son with her to Malaysia, and FIGUEROA
17 thought that a sick woman would likely not travel internationally with a child.
18 FIGUEROA believed that J.M.'s son was approximately two or three years old.
19 FIGUEROA knew the three-year-old went to school in Bellevue, Washington, but she did
20 not know where.

21      45.    FIGUEROA said that in November or December 2019, she "tried to send
22 [VICTIM] some images" on Facebook "about [the relationship between J.M.] and I."
23 FIGUEROA also said that, several years ago, she and her friend created a fake Facebook
24 account but claimed that she hadn't done so recently.

25      46.    Although earlier in the interview FIGUEROA repeatedly denied trying to
26 murder VICTIM, as the conversation continued, FIGUEROA admitted that she solicited
27 the murder. FIGUEROA explained that "[t]he person that did that, it was me, I don't
28 know this would help right now or not, but I tried to delete it, but I couldn't do it…"

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

FIGUEROA said that she had used an "old phone" to solicit the hit, downloading an application on her phone to hide her identity. Based on my training and experience, and information conveyed by FIGUEROA, I believe this application is a Tor browser, used to access the dark web. FIGUEROA explained that she purchased the services of an unknown individual to kill VICTIM, and paid for those services with $5,000 in bitcoin. FIGUEROA had previously explained that she was familiar with Bitcoin because she used it to purchase clothes from another country. FIGUEROA explained that there was an option on the website, where she had solicited the hit, to "delete" the transaction, but she was unable to do so because she could no longer access the website on her phone.

47.     FIGUEROA believed there was a "fifteen-fifty" chance that the website offering hitman services was a scam. When asked how FIGUEROA felt about VICTIM being killed, she stated she was nervous. When asked if she hoping J.M. would come live with her once his wife was killed, FIGUEROA said "…yeah." FIGUEROA denied that J.M. was involved in the plan to murder his wife. FIGUEROA said the phone she used to solicit the murder was currently at her home, in her bedroom in South Bend, Washington. She stated that she deleted her browser history on the phone and had not discussed the incident with anyone else.

48.     On February 21, 2020, Agent Schroff and I tried to interview FIGUEROA again but she invoked her right to counsel and declined to be interviewed. As described herein, FIGUEROA later participated in a proffer interview on March 17, 2020.

**F.     VICTIM's Facebook Account**

49.     I have reviewed VICTIM's Facebook account, with her consent, and located messages sent from an account held in the name of Katlyn Everson (**SUBJECT ACCOUNT 9**). When viewing this account publicly, neither a profile picture nor a cover photo are shown for Katyln Everson. It appeared that VICTIM had not yet accessed or opened these messages at the time that I viewed them.

50.     On December 17, 2019, the Everson account sent VICTIM a series of messages. First, the Everson account sent VICTIM a photograph of J.M., followed by a

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

message that stated "I know it's none of my business but [J.M] Im guessing your husband is cheating on u.  I know it because I know the person he's cheating on u with.  If u dont believe me, they're gonna meet up today at the Kizuki Ramen restaurant in Olympia at 4:30 PM.  You can prove it by yourself."

51.     On January 2, 2020, **SUBJECT ACCOUNT 9** account sent VICTIM a series of pictures, which appear to show J.M. kissing and sitting next to FIGUEROA, taken by what appears to be a third party at a neighboring table in the restaurant.

52.     I showed VICTIM a copy of the photograph provided to SOI-1, when the individual solicited VICTIM's murder.  VICTIM confirmed that this photograph is publicly accessible on VICTIM's Facebook page.

**G.     Follow-Up Interview of J.M.**

53.     March 3, 2020, I interviewed J.M.  During this interview, I again asked him about the Ring camera video, taken on December 23, 2019, when an unknown female rang VICTIM's front doorbell and asked for J.M. by name.  J.M. admitted that he knew the woman in the video was FIGUEROA and that he had previously lied to investigators when he denied recognizing the individual in the video.  J.M. stated that, after this video was taken, he talked to FIGUEROA and asked her why she had gone to his home.  FIGUEROA told J.M. that she was there to kill VICTIM and that she brought a knife with her in order to accomplish the murder.

54.     J.M. said that he had omitted this information from his prior interview because he was concerned his wife would find out about the affair.  J.M made the following statement regarding the time frame of his relationship with FIGUEROA, which he did not disclose to law enforcement during his first interview.  J.M started a friendship with FIGUEROA and her brother in August of 2018.  J.M. stated that the relationship evolved into a sexual relationship in the beginning of 2019.  J.M. said he ended the romantic relationship with FIGUEROA in the summer of 2019 but maintained a friendship with her.  J.M. stated that the relationship became romantic again in December

of 2019. J.M. stated that, the last time he saw FIGUEROA was on January 28, 2020, when they met for dinner.

**H.     FIGUEROA Proffer Interview**

55.     On March 17, 2020, I, along with others, interviewed FIGUEROA pursuant to a proffer agreement, in the presence of her counsel.

56.     During this proffer interview FIGUEROA confirmed that she had solicited VICTIM's murder.  FIGUEROA explained that she had been having an affair with VICTIM's husband J.M. since approximately the summer of 2018.  FIGUEROA explained that their relationship ebbed and flowed, with FIGUEROA ending the relationship at multiple points after FIGUEROA became frustrated that J.M. would not leave his wife.

57.     FIGUEROA explained that J.M. offered several excuses for why he would not leave his wife, including that his wife had cancer, he was afraid that he would lose custody of his child in a divorce, and that his wife had tried to take her life when he previously threatened her with divorce.  FIGUEROA claimed that J.M. told her that they could not be together until his wife died or something happened.

58.     FIGUEROA stated that she and J.M. rekindled their romance for the final time in the fall of 2019.  After returning to her relationship with J.M., FIGUEROA took several steps to try to end J.M. and VICTIM's marriage.

59.     First, FIGUEROA tried to send VICTIM pictures of herself and J.M. being intimate at a restaurant.  To do this, FIGUEROA set up a fake Facebook account (**SUBJECT ACCOUNT 9**) and sent pictures to VICTIM.  These pictures were taken by FIGUEROA's cousin, who was seated at a nearby table when J.M. and FIGUEROA were having dinner.  FIGUEROA asked her cousin to take these photographs so she could send them to VICTIM.  After sending these photographs, FIGUEROA received no response from VICTIM.

60.     FIGUEROA then escalated her behavior, deciding to go to VICTIM's home to tell her in person about the affair.  FIGUEROA and J.M. made plans to meet for

dinner at a restaurant in Olympia.  Knowing that J.M. would be on his way to the restaurant, FIGUEROA went to VICTIM's house and told VICTIM that she was looking for J.M.  When VICTIM said that J.M. was not home, FIGUEROA explained that she had something to tell VICTIM.  At that point, J.M. started speaking to FIGUEROA using the Ring camera connected to VICTIM's home and FIGUEROA decided to leave.

61.     FIGUEROA explained that, after leaving the house, FIGUEROA met J.M. for dinner.  J.M. asked why FIGUEROA went to his home, and FIGUEROA told him that she went there to kill VICTIM.  FIGUEROA stated that she did not really intend to kill VICTIM, and was not armed when she went to the home, but told J.M. this because she was upset.  FIGUEROA claimed that J.M. wasn't angry but instead saw the behavior as a sign of her dedication and affection for him.

62.     FIGUEROA claimed that, in the past, J.M. had made comments about wanting to kill his wife and once asked FIGUEROA if she knew anyone who would kill his wife.

63.     FIGUEROA confirmed that J.M. had previously sent her money using Facebook messenger and recently sent her $2,000 using PayPal.  FIGUEROA explained that she used this $2,000, along with money she had saved from her college scholarship, to solicit VICTIM's murder.  FIGUEROA said that J.M. did not know that she planned on hiring a hitman on the dark web, but believed that J.M. would be pleased if he found out that she had.

64.     FIGUEROA stated that, to solicit the murder, she used her old phone, a phone that she had obtained from her pastor that was not linked to her.  She then googled the dark web, downloaded an application to access the dark web, and located several sites offering hitmen services.  FIGUEROA studied those sites, reviewing comments and requesting information on pricing, before selecting her hitman.  FIGUEROA explained that these sites offered a multitude of services, offering to beat, maim, or kill victims, to be carried out by hitmen with a range of experience levels.  She selected SOI-1's site because it had an escrow system, giving her a sense of security that her funds would not

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 20
USAO# 2020R00187

be stolen.  FIGUEROA explained that, to solicit the hit, she sent a message to SOI-1 on this website, sending SOI-1 VICTIM's Facebook profile picture, VICTIM's name and address, requesting that SOI-1 shoot VICTIM in the head, telling SOI-1 that she would release the funds from escrow once she had a picture of the VICTIM murdered, and asking SOI-1 not to harm VICTIM's child.

65.     To obtain the $5,000 in bitcoin necessary to pay for the hit, FIGUEROA explained that she went to a number of websites that offered bitcoin wallet services. FIGUEROA used fake names and email addresses on these websites, including at least one email address using the domain @outlook.com.  FIGUEROA said that she went to multiple websites, stopping after each site asked her for identifying information or a copy of her driver's license.  Finally, she found a website that didn't ask her for any identifying information, and FIGUEROA opened a wallet on that site using a fake email address that began with the name Nicole, believed by law enforcement to be nicolestigall22@outlook.com **(SUBJECT ACCOUNT 6)**.

66.     To purchase the bitcoin, FIGUEROA went to a bitcoin ATM, located outside a gas station in Olympia, Washington.  After FIGUEROA put cash into this ATM and scanned her wallet address, bitcoin was transferred to her wallet.  FIGUEROA went to this ATM twice in order to obtain enough bitcoin to pay for the hit.  FIGUEROA then transferred this bitcoin to a wallet address provided by SOI-1.

67.     After paying these funds, FIGUEROA claimed that weeks went by and SOI-1 had still not murdered VICTIM.  FIGUEROA went back to SOI-1's website and asked him/her about the delay.  SOI-1 told FIGUEROA that the hitman who had been hired was arrested and they were going to staff another hitman to complete the hit.

68.     In addition to contacting SOI-1, FIGUEROA explained that she also contacted a second hitman, communicating with this hitman via email.  FIGUEROA, through her counsel, later stated that she used the email account jackemerson@outlook.com (**SUBJECT ACCOUNT 7**) to communicate with that hitman.  FIGUEROA sent that hitman VICTIM's photograph and address but declined to

1  use that hitman's services because he/she was more expensive and less reliable than SOI-

2  1.

3  **I.      THE SUBJECT ACCOUNTS**

4           69.      While they were having an affair, FIGUEROA and J.M. communicated

5  using **SUBJECT ACCOUNTS 2-4.**

6               a.      For example, according to information obtained from Google, on

7  August 12, 2018, J.M. used jonasmccoy@gmail.com (**SUBJECT ACCOUNT 2**)[12] to

8  send an email to FIGUEROA, using lluviafigueroa22@hotmail.com (**SUBJECT**

9  **ACCOUNT 3**).[13]

10              b.      On September 28, 2018, an email was sent from

11 jonasmccoy@gmail.com (**SUBJECT ACCOUNT 2**) to lluviafigueroa22@hotmail.com

12 (**SUBJECT ACCOUNT 3**).

13              c.      On October 9, 2018, jonasmccoy@gmail.com (**SUBJECT**

14 **ACCOUNT 2**) emailed FIGUEROA, using the email address lfigueroa@my.ghc.edu

15 (**SUBJECT ACCOUNT 4**).[14]

16              d.      On November 23, 2019, lfigueroa@my.ghc.edu (**SUBJECT**

17 **ACCOUNT 4**) sent an email to jonasmccoy@gmail.com (**SUBJECT ACCOUNT 2**).

18              e.      On January 24, 2020, an email was sent from

19 lluviafigueroa22@hotmail.com (**SUBJECT ACCOUNT 3**) to jonasmccoy@gmail.com

20 (**SUBJECT ACCOUNT 2**).

21              f.      On February 9, 2020, an email was sent from

22 jonasmccoy@gmail.com (**SUBJECT ACCOUNT 2**) to lluviafigueroa22@hotmail.com

23 (**SUBJECT ACCOUNT 3**).

24

25  _____

26 [12] According to Google, the email account **jonasmccoy@gmail.com (SUBJECT ACCOUNT 2)** was registered in the name of J.M. on February 3, 2006.

27 [13] According to Microsoft, the email address **lluviafigueroa22@hotmail.com (SUBJECT ACCOUNT 3)** was registered in the name of LLUVIA FIGUEROA on August 5, 2017.

28 [14] FIGUEROA is a student at Grays Harbor Community College.  As described herein, this account is serviced by Microsoft.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 22
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

70.     During the time period of the affair, J.M. and FIGUEROA also used **SUBJECT ACCOUNTS 7** and **9** on Facebook to communicate and so that J.M. could send money to FIGUEROA.

a.     FIGUEROA used the account lluviaselene.sierrafigueroa (Facebook ID 100002531010182) (**SUBJECT ACCOUNT 7**).  According to Facebook, this account was registered in the name of LLUVIA FIGUEROA on May 23, 2011.

b.     J.M. used the account cmarison (Facebook ID 28501000) (**SUBJECT ACCOUNT 9**).  According to Facebook, this account was registered in the name of J.M. on December 5, 2004.

c.     From September 2018 through August 2019, FIGUEROA, using **SUBJECT ACCOUNT 7**, exchanged messages with J.M., using **SUBJECT ACCOUNT 9**, on Facebook.  Both also had payment information registered to their accounts.

71.     FIGUEROA also used a variety of fake accounts to communicate with VICTIM and/or further her plot to murder VICTIM.

a.     FIGUEROA used the Facebook account katlyn.everson.5 (**SUBJECT ACCOUNT 8**) to send VICTIM intimate photographs of her and J.M. at a restaurant and to alert VICTIM to the affair.  FIGUEROA explained that she created this **SUBJECT ACCOUNT 8** so she could anonymously communicate with VICTIM.

b.     FIGUEROA also stated that she created fake email accounts in furtherance of her crimes.  The FBI searched FIGUEROA's phone, pursuant to a warrant, and located two accounts—kendranewman22@outlook.com (**SUBJECT ACCOUNT 5**) and nicolestigall22@outlook.com (**SUBJECT ACCOUNT 6**) listed in the phone.  According to information obtained from Microsoft, **SUBJECT ACCOUNT 5** was registered in the name of "Kendra Newman" on May 3, 2019.  **SUBJECT ACCOUNT 6** was registered in the name

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 23
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of "Nicole Stigall" on April 28, 2019.  According to IP login history for these accounts, both were logged into on March 17, 2020 (the day of FIGUEROA's proffer) using the IP address 98.237.218.5.  FIGUEROA has also used that IP address to log into **SUBJECT ACCOUNTS 3** and **8.**  According to publicly accessible search engines, this IP address geolocates to Comcast Communications in Aberdeen, Washington, near where FIGUEROA resides.

c.     According to information obtained from Microsoft, it appears that FIGUEROA used **SUBJECT ACCOUNT 5** to communicate with Facebook regarding **SUBJECT ACCOUNT 8**. For example, on March 8, 2020, Facebook sent **SUBJECT ACCOUNT 5** an email, directed to the user "Katlyn Everson."

d.     According to information obtained from Microsoft, it appears that FIGUEROA used **SUBJECT ACCOUNT 6** to communicate with cryptocurrency companies.  For example, according to information obtained from Microsoft, on January 13, 2020, **SUBJECT ACCOUNT 6** sent an email to support@coinmama.com, a cryptocurrency exchange platform that enables users to buy or sell bitcoin using a credit card, debit card, or bank transfer.

e.     Finally, according to FIGUEROA, she used the email account jackemerson@outlook.com (**SUBJECT ACCOUNT 1**) to communicate with the second hitman who did she decided not to hire after providing him/her with VICTIM's identifying information.  According to Microsoft, **SUBJECT ACCOUNT 1** was registered in the name of "Jack Emerson" in the United Kingdom on October 31, 2016 and has been accessed using an IP address that geolocates to the United Kingdom.  This email account has a number of emails stored in it, including those sent from BB gun sites, video game sites, and cryptocurrency sites.  It is believed that this email address belongs to the hitman that FIGUEROA discussed, but declined to, hire.

72.     In order to gather information related to FIGUEROA's efforts to solicit VICTIM's murder, including evidence that FIGUEROA was having an

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 24
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  affair with J.M., FIGUEROA accepted money from J.M., FIGUEROA used a fake

2  account to communicate with VICTIM, FIGUEROA purchased cryptocurrency in

3  order to pay for the hit, and FIGUEROA communicated with another hitman

4  during this time period, I request authorization to search the **SUBJECT**

5  **ACCOUNTS**.

6              **BACKGROUND CONCERNING ONLINE ACCOUNTS**

7        73.    As explained herein, information stored in connection with an online

8  account may provide crucial evidence of the "who, what, why, when, where, and how" of

9  the criminal conduct under investigation, thus enabling the United States to establish and

10  prove each element or alternatively, to exclude the innocent from further suspicion.

11        74.    In my training and experience, the information stored in connection with an

12  online account can indicate who has used or controlled the account. This "user

13  attribution" evidence is analogous to the search for "indicia of occupancy" while

14  executing a search warrant at a residence. For example, email communications, contacts

15  lists, and images sent (and the data associated with the foregoing, such as date and time)

16  may indicate who used or controlled the account at a relevant time.

17        75.    Further, information maintained by the email provider can show how and

18  when the account was accessed or used. For example, as described below, email

19  providers typically log the Internet Protocol (IP) addresses from which users access the

20  email account, along with the time and date of that access. By determining the physical

21  location associated with the logged IP addresses, investigators can understand the

22  chronological and geographic context of the email account access and use relating to the

23  crime under investigation. This geographic and timeline information may tend to either

24  inculpate or exculpate the account owner. Additionally, information stored at the user's

25  account may further indicate the geographic location of the account user at a particular

26  time (e.g., location information integrated into an image or video sent via email).

27        76.    Stored electronic data may provide relevant insight into the email account

28  owner's state of mind as it relates to the offense under investigation. For example,

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 25
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  information in the email account may indicate the owner's motive and intent to commit a

2  crime (e.g., communications relating to the crime), or consciousness of guilt (e.g.,

3  deleting communications in an effort to conceal them from law enforcement).

### 1. Google's Services

5  77.     In my training and experience, I have learned that Google provides a

6  variety of online services, including electronic mail ("email") access and instant

7  messaging (otherwise known as "chat" messaging), to the general public.  Google

8  provides subscribers email and chat accounts at the domain name "@gmail.com."

9  Google also allows subscribers to register a custom domain name and set up Google

10  services such as chat and email using that domain name instead of "@gmail.com."

11  **A. Subscriber Records and Account Content**

12  78.     Subscribers obtain an account by registering with Google.  When doing so,

13  email providers like Google ask the subscriber to provide certain personal identifying

14  information.  This information can include the subscriber's full name, physical address,

15  telephone numbers and other identifiers, alternative email addresses, and, for paying

16  subscribers, means and source of payment (including any credit or bank account number).

17  In my training and experience, such information may constitute evidence of the crimes

18  under investigation because the information can be used to identify the account's user or

19  users, and to help establish who has dominion and control over the account. [15]

20  79.     Email providers typically retain certain transactional information about the

21  creation and use of each account on their systems.  This information can include the date

22  on which the account was created, the length of service, records of log-in (*i.e.*, session

23  times and durations, the types of service utilized, the status of the account (including

24  whether the account is inactive or closed), the methods used to connect to the account

25  (such as logging into the account via Google's websites), and other log files that reflect

26  _____

27  [15] The relevance of the evidence in Google's possession to the present investigation, applies with
equal force to the evidence in the possession of Microsoft.  For the sake of brevity, the
28  explanation of this relevance will not be fully repeated with respect to Microsoft below.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 26
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

usage of the account.  In addition, email providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

80.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

81.     In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google's servers until the subscriber deletes the email.  When the subscriber sends an email, it is initiated at the user's computer, transferred via the Internet to Google servers, and then transmitted to its end destination.  Google often maintains a copy of received and sent emails.  Unless the sender specifically deletes an email from the Google server, the email can remain on the system indefinitely.  Even if the subscriber deletes the email, it may continue to be available on Google's servers for some period of time.

82.     A sent or received email typically includes the content of the message, source and destination addresses, the date and time at which the email was sent, and the size and length of the email.  If an email user writes a draft message but does not send it, that message may also be saved by Google but may not include all of these categories of data.

83.     In addition to email and chat, Google offers subscribers numerous other services including:  Android, Blogger, Google Alerts, Google Calendar, Google Chrome

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 27
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Sync, Google Cloud Print, G-Suite, Google Developers Console, Google Drive, Google Hangouts, Google Maps, Google Payments, Google Photos, Google Search Console, Google Voice, Google+, Google Profile, Location History, Web & Activity, Search, and YouTube, among others.  Thus, a subscriber to a Google account can also store files, including address books, contact lists, calendar data, photographs and other files, on servers maintained and/or owned by Google.  For example, Google Calendar is a calendar service that users may utilize to organize their schedule and share events with others.  Google Drive may be used to store data and documents, including spreadsheets, written documents (such as Word or Word Perfect) and other documents.  Google Photos can be used to create photo albums, store photographs, and share photographs with others and "You Tube," allows users to view, store and share videos.  Google Search Console records a Google account user's search queries.  And Google Web & Activity records certain browsing history depending on whether the account holder is logged into their account.  Like many internet service companies (including the companies discussed below), the services Google offers are constantly changing and evolving.

## 2. Microsoft's Services

84.     Microsoft is an internet service provider that offers a variety of online services including email accounts (Outlook.com or Hotmail), cloud computing (Microsoft OneDrive, Office and Office365), gaming services (Xbox), video conferencing (Skype), web browsing and search tools (Bing Search, Microsoft Edge, and Internet Explorer), maps, an online marketplace (Microsoft Store), and other services. Microsoft also provides remote computing services for devices that use Windows operating systems, including security services and parental control services which collect information about the use of the devices (e.g., internet browsing history, software usage history, and other information).

85.     A Microsoft account (formerly known as a Windows Live account) is what Microsoft customers may use to sign into Microsoft services such as Outlook.com (or Hotmail), Office, OneDrive, Skype, Xbox, Windows, and more.  A user may create a

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 28
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Microsoft account with any email address (Microsoft accounts are not limited to those

2   who use Microsoft email accounts) and a password and thereafter use that email address

3   and password to sign in to any Microsoft program or service.

4        86.    According to online databases, Microsoft services the domain @

5   my.ghc.edu, on behalf of Grays Harbor Community College.

6        87.    In my training and experience email providers like Microsoft typically

7   retain certain transactional information about the creation and use of each account on

8   their systems.  This information can include the date on which the account was created,

9   the length of service, records of log-in (*i.e.*, session) times and durations, the types of

10  service utilized, the status of the account (including whether the account is inactive or

11  closed), the methods used to connect to the account (such as logging into the account via

12  a website), and other log files that reflect usage of the account.  In addition, email

13  providers often have records of the IP address used to register the account and the IP

14  addresses associated with particular logins to the account.  Because every device that

15  connects to the Internet must use an IP address, IP address information can help to

16  identify which computers or other devices were used to access the email account, which

17  can help establish the individual or individuals who had dominion and control over the

18  account

19       88.    In general, an email that is sent to a Microsoft subscriber is stored in the

20  subscriber's "mail box" on Microsoft's servers until the subscriber deletes the email.  If

21  the subscriber does not delete the message, the message can remain on Microsoft's

22  servers indefinitely.  Even if the subscriber deletes the email, it may continue to be

23  available on Microsoft's servers for a certain period of time.

24       89.    When the subscriber sends an email, it is initiated at the user's computer,

25  transferred via the Internet to Microsoft's servers, and then transmitted to its end

26  destination.  Microsoft often maintains a copy of the email sent.  Unless the sender of the

27  email specifically deletes the email from Microsoft's server, the email can remain on the

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 29
USAO# 2020R00187

1  system indefinitely.  Even if the sender deletes the email, it may continue to be available
2  on Microsoft's servers for a certain period of time.

3      90.    A sent or received email typically includes the content of the message,
4  source and destination addresses, the date and time at which the email was sent, and the
5  size and length of the email.  If an email user writes a draft message but does not send it,
6  that message may also be saved by Microsoft but may not include all of these categories
7  of data.

8      91.    Microsoft provides a variety of online, or "cloud," services in addition to
9  email access, to the public and to customers who utilize Hotmail accounts that are served
10  by Microsoft.  Microsoft's various cloud services are associated with a single Microsoft
11  account, which is typically associated with a Microsoft email address, but can be
12  associated with any email address.  The various cloud services provided by Microsoft are
13  optional and can be turned "on" or "off" by the user.

14      92.    In providing services such as Outlook, OneDrive, Xbox, calendar services,
15  online file storage, storage of browsing history, storage of search history, and locations
16  history, Microsoft collects information that constitute evidence of the crimes under
17  investigation.  For example, such evidence can be used to discover or confirm the identity
18  and location users of the service at a particular time.

19                **c. Facebook's Services**

20      93.    Facebook owns and operates a free-access social networking website of the
21  same name that can be accessed at http://www.facebook.com.  Facebook allows its users
22  to establish accounts with Facebook, and users can then use their accounts to share
23  written news, photographs, videos, and other information with other Facebook users, and
24  sometimes with the general public.

25      94.    Facebook asks users to provide basic contact and personal identifying
26  information to Facebook, either during the registration process or thereafter.  This
27  information may include the user's full name, birth date, gender, contact e-mail
28  addresses, Facebook passwords, physical address (including city, state, and zip code),

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 30
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   telephone numbers, screen names, websites, and other personal identifiers.  Facebook
2   also assigns a user identification number to each account.

3        95.     Facebook users may join one or more groups or networks to connect and
4   interact with other users who are members of the same group or network.  Facebook
5   assigns a group identification number to each group.  A Facebook user can also connect
6   directly with individual Facebook users by sending each user a "Friend Request."  If the
7   recipient of a "Friend Request" accepts the request, then the two users will become
8   "Friends" for purposes of Facebook and can exchange communications or view
9   information about each other.  Each Facebook user's account includes a list of that user's
10   "Friends" and a "News Feed," which highlights information about the user's "Friends,"
11   such as profile changes, upcoming events, and birthdays.

12        96.     Facebook users can select different levels of privacy for the
13   communications and information associated with their Facebook accounts.  By adjusting
14   these privacy settings, a Facebook user can make information available only to himself or
15   herself, to particular Facebook users, or to anyone with access to the Internet, including
16   people who are not Facebook users.  A Facebook user can also create "lists" of Facebook
17   friends to facilitate the application of these privacy settings.  Facebook accounts also
18   include other account settings that users can adjust to control, for example, the types of
19   notifications they receive from Facebook.

20        97.     Facebook users can create profiles that include photographs, lists of
21   personal interests, and other information.  Facebook users can also post "status" updates
22   about their whereabouts and actions, as well as links to videos, photographs, articles, and
23   other items available elsewhere on the Internet.  Facebook users can also post information
24   about upcoming "events," such as social occasions, by listing the event's time, location,
25   host, and guest list.  In addition, Facebook users can "check in" to particular locations or
26   add their geographic locations to their Facebook posts, thereby revealing their geographic
27   locations at particular dates and times.  A particular user's profile page also includes a
28   "Wall," which is a space where the user and his or her "Friends" can post messages,

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 31
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

attachments, and links that will typically be visible to anyone who can view the user's profile.

98.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

99.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

100.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

101.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

102.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 32
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

103.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

104.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

105.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

106.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

107.    Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 33
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   provider's support services, as well as records of any actions taken by the provider or

2   user as a result of the communications.

3        108.    As explained herein, information stored in connection with a Facebook

4   account may provide crucial evidence of the "who, what, why, when, where, and how" of

5   the criminal conduct under investigation, thus enabling the United States to establish and

6   prove each element or alternatively, to exclude the innocent from further suspicion.  In

7   my training and experience, a Facebook user's IP log, stored electronic communications,

8   and other data retained by Facebook, can indicate who has used or controlled the

9   Facebook account.  This "user attribution" evidence is analogous to the search for

10  "indicia of occupancy" while executing a search warrant at a residence.  For example,

11  profile contact information, private messaging logs, status updates, and tagged photos

12  (and the data associated with the foregoing, such as date and time) may be evidence of

13  who used or controlled the Facebook account at a relevant time.  Further, Facebook

14  account activity can show how and when the account was accessed or used.  For

15  example, as described herein, Facebook logs the Internet Protocol (IP) addresses from

16  which users access their accounts along with the time and date.  By determining the

17  physical location associated with the logged IP addresses, investigators can understand

18  the chronological and geographic context of the account access and use relating to the

19  crime under investigation.  Such information allows investigators to understand the

20  geographic and chronological context of Facebook access, use, and events relating to the

21  crime under investigation.  Additionally, Facebook builds geo-location into some of its

22  services.  Geo-location allows, for example, users to "tag" their location in posts and

23  Facebook "friends" to locate each other.  This geographic and timeline information may

24  tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook

25  account activity may provide relevant insight into the Facebook account owner's state of

26  mind as it relates to the offense under investigation.  For example, information on the

27  Facebook account may indicate the owner's motive and intent to commit a crime (e.g.,

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 34
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting

2    account information in an effort to conceal evidence from law enforcement).

3        109.    Therefore, the computers of Facebook are likely to contain all the material

4    described above, including stored electronic communications and information concerning

5    subscribers and their use of Facebook, such as account access information, transaction

6    information, and other account information**.**

7            **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

8        110.    Pursuant to Title 18, United States Code, Section 2703(g), this application

9    and affidavit for a search warrant seeks authorization to require **THE PROVIDERS**, and

10   their agents and employees, to assist agents in the execution of this warrant.  Once issued,

11   the search warrant will be presented to **THE PROVIDERS** with direction that they

12   identify the accounts described in Attachments A-1, A-2, and A-3 to this affidavit, as

13   well as other subscriber and log records associated with the accounts, as set forth in

14   Section I of Attachments B-1, B-2, and B-3 to this affidavit.

15       111.    The search warrant will direct **THE PROVIDERS** to create an exact copy

16   of the specified account and records.

17       112.    I, and/or other law enforcement personnel will thereafter review the copy of

18   the electronically stored data and identify from among that content those items that come

19   within the items identified in Section II to Attachments B-1, B-2, and B-3 for seizure.

20       113.    Analyzing the data contained in the forensic copy may require special

21   technical skills, equipment, and software.  It could also be very time-consuming.

22   Searching by keywords, for example, can yield thousands of "hits," each of which must

23   then be reviewed in context by the examiner to determine whether the data is within the

24   scope of the warrant.  Merely finding a relevant "hit" does not end the review process.

25   Keywords used originally need to be modified continuously, based on interim results.

26   Certain file formats, moreover, do not lend themselves to keyword searches, as keywords,

27   search text, and many common email, database and spreadsheet applications do not store

28   data as searchable text.  The data may be saved, instead, in proprietary non-text format.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 35
USAO# 2020R00187

And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases, as well.   Consistent with the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months.  All forensic analysis of the data will employ only those search protocols and methodologies reasonably designed to identify and seize the items identified in Section II of Attachments B-1, B-2, and B-3 to the warrant.

114.    Based on my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize a variety of e-mail communications, chat logs and documents, that identify any users of the subject account and e-mails sent or received in temporal proximity to incriminating e-mails that provide context to the incriminating communications.

## CONCLUSION

115.    Based on the forgoing, I respectfully request that the Court issue the proposed search warrant.  This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that - has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).  Additionally, for information sought from Microsoft, the Court "is in . . . a district in which the provider . . . is located or in which the wire or electronic communications, records, or other information are stored." 18 U.S.C. § 2711(3)(A)(ii).  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 36
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

116.   Accordingly, by this Affidavit and Warrant I seek authority for the government to search all of the items specified in Section I, Attachments B-1, B-2, and B-3 (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

_____
Allana Kleinosky, Affiant
Special Agent


The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit on the ___10___ day of April, 2020.

_____
HONORABLE BRIAN A. TSUCHIDA
United States Magistrate Judge

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 37
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>ATTACHMENT A-1</u>

### Google Accounts to be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Google account:

### jonasmccoy@gmail.com (SUBJECT ACCOUNT 2)

(the "Account") that are stored at a premises controlled by Google, LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway in Mountain View, California.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 38
USAO# 2020R00187

**ATTACHMENT B-1**

**Particular Things to be Seized**

**I. Information to be disclosed by Google, LLC:**

To the extent that the information described in Attachment A-1 is within the possession, custody, or control of Google, LLC ("Google"), including any data, messages, records, files, logs, or information that has been deleted but is still available to Google, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Google is required to disclose the following information to the government for each Account or identifier listed in Attachment A-1, from June 1, 2018 to the present:

        a.     All electronic mail content and/or preserved data (including email, attachments, and embedded files);

        b.     All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Google in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

        c.     all contact lists;

        d.     all account history, including any records of communications between Google and any other person about issues relating to the accounts, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber in connection with the service.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 39
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Google is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Section 1958 (Murder for Hire), those violations occurring between June 2018 and the present, for each of the Accounts listed on Attachment A-1, including the following:

a.    any information related to FIGUEROA, including communications with or about FIGUEROA, plans to meet FIGUEROA, and photographs of FIGUEROA;

b.    any information related to J.M.'s relationship with FIGUEROA, including a romantic relationship with FIGUEROA;

c.    any information related to J.M.'s relationship with VICTIM, including communications regarding divorce, separation, or illness, or evidence that J.M. was unhappy in his marriage or sough to murder VICTIM;

d.    any information related to a plan to solicit murder, including by accessing websites or contacting individuals to solicit murder;

e.    any information related to J.M.'s or FIGUEROA's attendance at a Landmark course or FIGUEROA's attempts to visit or actual visits to VICTIM's house;

f.    any information related to payments made by J.M. to FIGUEROA;

g.    any information related to FIGUEROA's transfer, purchase, sale, or disposition of Bitcoin or other cryptocurrency;

h.    any information related to J.M.'s or FIGUEROA's assets, including their bank records, checks, credit card bills, account information, and other financial records, to include life insurance policies.

i.    any information related to use of the dark web, including use or downloading of a Tor browser;

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 40
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1          j.     any information related to J.M.'s statements to FIGUEROA
2    regarding VICTIM;

3          k.     any information related to efforts to delete browsing history or
4    undertake other acts to remain anonymous online, including by accessing VPNs or
5    creating multiple email accounts in a short time frame;

6          l.     any information consisting of, referring to, or reflecting use of
7    cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and
8    related private encryption keys, seed phrases, or other passwords;

9          m.    any information consisting of, referring to, or reflecting use of
10   encryption or digital signature software, such as PGP encryption, and related public and
11   private encryption keys;

12         n.     any information related to cryptocurrency applications and wallets,
13   to include information regarding current account balance and transaction history, *i.e.*,
14   date, time, amount, an address of the sender/recipient of a cryptocurrency transaction
15   maintained in such wallets;

16         o.     any information reflecting cryptocurrencies, including web history,
17   and documents showing the location, source, and timing of acquisition of any
18   cryptocurrencies, to include wallets, wallet addresses, and seed phrases; and

19         p.     Evidence that serves to identify any person who uses or accesses the
20   Account or who exercises in any way any dominion or control over the Account;

21         q.     Evidence that may identify the aliases names, online user names,
22   "handles" and/or "nics" of those who exercise in any way any dominion or control over
23   the specified Accounts as well as records or information that may reveal the true
24   identities of these individuals;

25         r.     Other log records, including IP address captures, associated with the
26   specified Accounts;

27         s.     Subscriber records associated with the specified Account, including
28   1) names, email addresses, and screen names; 2) physical addresses; 3) records of session

1  times and durations; 4) length of service (including start date) and types of services
2  utilized; 5) telephone or instrument number or other subscriber number or identity,
3  Including any temporarily assigned network address such as IP address, media access
4  card addresses, or any other unique device identifiers recorded by internet service
5  provider in relation to the account; 6) account log files (login IP address, account
6  activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means
7  and source of payment; and 9) lists of all related accounts;

8         t.    Records of communications between the internet service provider
9  and any person purporting to be the account holder about issues relating to the Account,
10 such as technical problems, billing inquiries, or complaints from other users about the
11 specified Account.  This to include records of contacts between the subscriber and the
12 provider's support services, as well as records of any actions taken by the provider or
13 subscriber as a result of the communications.

14        u.    Information identifying accounts that are linked or associated with
15 the Account.

16

17     This warrant authorizes a review of electronically stored information,
18 communications, other records and information disclosed pursuant to this warrant in
19 order to locate evidence, fruits, and instrumentalities described in this warrant.  The
20 review of this electronic data may be conducted by any government personnel assisting in
21 the investigation, who may include, in addition to law enforcement officers and agents,
22 attorneys for the government, attorney support staff, and technical experts.  Pursuant to
23 this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the
24 custody and control of attorneys for the government and their support staff for their
25 independent review.

26
27
28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 42
USAO# 2020R00187

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____ [GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]. I further state that:

         a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

         b.     such records were generated by _____'s electronic process or system that produces an accurate result, to wit:

     1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

     2.     the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

Date        Signature

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 43
USAO# 2020R00187

## ATTACHMENT A-2

### Microsoft Accounts to be Searched

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Microsoft accounts:

jackemerson@outlook.com (**SUBJECT ACCOUNT 1**)

lluviafigueroa22@hotmail.com (**SUBJECT ACCOUNT 3**)

lfigueroa@my.ghc.edu (**SUBJECT ACCOUNT 4**)

kendranewman22@outlook.com (**SUBJECT ACCOUNT 5**)

nicolestigall22@outlook.com (**SUBJECT ACCOUNT 6**)

(the "Accounts") that are stored at a premises controlled by Microsoft Corporation, a company that accepts service of legal process at 1 Microsoft Way in Redmond, Washington.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 44
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **ATTACHMENT B-2**

### **Particular Things to be Seized**

**I.  Information to be disclosed by Microsoft Corporation:**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of Microsoft Corporation ("Microsoft"), including any data, messages, records, files, logs, or information that has been deleted but is still available to Microsoft, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Microsoft is required to disclose the following information to the government for each account or identifier listed in Attachment A-2, from June 2018 to the present:

a.      All electronic mail content and/or preserved data (including email, attachments, and embedded files);

b.      All subscriber records associated with the specified account, including 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as IP address, media access card addresses, or any other unique device identifiers recorded by Microsoft in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all related accounts;

c.      all contact lists;

d.      any Microsoft Chat/Messenger information and/or records, including any Microsoft Chat/Messenger Friends list, time, date, and IP address logs for Chat and Messenger use, and any archived web messenger communications stored on Microsoft servers;

e.      any Microsoft Notepad information and/or records;

f.      any Microsoft Calendar information and/or records,

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 45
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

g.      any Microsoft Groups information and/or records including member lists, e-mail addresses of members, messages, files, calendars, database content, and photographs;

h.      any stored documents;

i.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

j.      The types of service utilized;

k.      All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

l.      All account history, including any records of communications between Microsoft and any other person about issues relating to the accounts, such as technical problems, billing inquiries, or complaints from other users about the specified account. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber in connection with the service.

Microsoft is hereby ordered to disclose the above information to the government within **14 days** of service of this warrant.

**II.**      **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Section 1958

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 46
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(Murder for Hire), those violations occurring between June 2018 and the present, for each of the Accounts listed on Attachment A-2, including the following:

    a.    any information related to J.M.'s relationship with FIGUEROA, including communications between the two, plans to meet, and photographs of FIGUEROA and J.M. (together or held by or sent to the other);

    b.    any information related to romantic feelings between J.M. and FIGUEROA, desire to remain a couple, or desire to break up or end their affair;

    c.    any information related to FIGUEROA's desire to have J.M. end his marriage or to marry or solely be romantically involved with FIGUEROA.

    d.    any information related to J.M.'s relationship with VICTIM, including communications regarding divorce, separation, or illness, or evidence that J.M. was unhappy in his marriage or sough to murder VICTIM;

    e.    any information related to a plan to solicit murder, including by accessing websites or contacting individuals to solicit murder;

    f.    any information related to J.M.'s or FIGUEROA's attendance at a Landmark course or FIGUEROA's attempts to visit or actual visits to VICTIM's house;

    g.    any information related to payments made by J.M. to FIGUEROA;

    h.    any information related to FIGUEROA's transfer, purchase, sale, or disposition of Bitcoin or other cryptocurrency;

    i.    any information related to J.M.'s or FIGUEROA's assets, including their bank records, checks, credit card bills, account information, and other financial records, to include life insurance policies.

    j.    any information related to use of the dark web, including use or downloading of a Tor browser;

    k.    any information related to J.M.'s statements to FIGUEROA regarding VICTIM;

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 47
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

l.      any information related to efforts to delete browsing history or undertake other acts to remain anonymous online, including by accessing VPNs or creating multiple email accounts in a short time frame;

m.      any information related to the creation of a fake Facebook account to contact VICTIM or fake email accounts to use in furtherance of the solicitation for murder;

n.      any information related to prior attempts to harm or threaten VICTIM, or to reveal J.M.'s and FIGUEROA's affair;

o.      any information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords;

p.      any information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

q.      any information related to cryptocurrency applications and wallets, to include information regarding current account balance and transaction history, *i.e.*, date, time, amount, an address of the sender/recipient of a cryptocurrency transaction maintained in such wallets;

r.      any information reflecting cryptocurrencies, including web history, and documents showing the location, source, and timing of acquisition of any cryptocurrencies, to include wallets, wallet addresses, and seed phrases; and

s.      Evidence that serves to identify any person who uses or accesses the Accounts or who exercises in any way any dominion or control over the Accounts;

t.      Evidence that may identify the aliases names, online user names, "handles" and/or "nics" of those who exercise in any way any dominion or control over the specified Accounts as well as records or information that may reveal the true identities of these individuals;

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 48
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      u.     Other log records, including IP address captures, associated with the
2 specified Accounts;

3      v.     Subscriber records associated with the specified Accounts, including
4 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session
5 times and durations; 4) length of service (including start date) and types of services
6 utilized; 5) telephone or instrument number or other subscriber number or identity,
7 Including any temporarily assigned network address such as IP address, media access
8 card addresses, or any other unique device identifiers recorded by internet service
9 provider in relation to the account; 6) account log files (login IP address, account
10 activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means
11 and source of payment; and 9) lists of all related accounts;

12      w.     Records of communications between the internet service provider
13 and any person purporting to be the account holder about issues relating to the Accounts,
14 such as technical problems, billing inquiries, or complaints from other users about the
15 specified Accounts.  This to include records of contacts between the subscriber and the
16 provider's support services, as well as records of any actions taken by the provider or
17 subscriber as a result of the communications.

18      x.     Information identifying accounts that are linked or associated with
19 the Accounts.

20     This warrant authorizes a review of electronically stored information,
21 communications, other records and information disclosed pursuant to this warrant in
22 order to locate evidence, fruits, and instrumentalities described in this warrant.  The
23 review of this electronic data may be conducted by any government personnel assisting in
24 the investigation, who may include, in addition to law enforcement officers and agents,
25 attorneys for the government, attorney support staff, and technical experts.  Pursuant to
26 this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the
27 custody and control of attorneys for the government and their support staff for their
28 independent review.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 49
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by _____, and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____ [GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)].  I further state that:

                a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

                b.      such records were generated by _____'s electronic process or system that produces an accurate result, to wit:

        1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

        2.      the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

Date        Signature

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 50
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT A-3**

**Facebook Accounts to be Searched**

The electronically stored data, information and communications contained in, related to, and associated with, including all preserved data associated with Facebook accounts:

lluviaselene.sierrafigueroa (Facebook ID 100002531010182)

(**SUBJECT ACCOUNT 7**)

katlyn.everson.5 (**SUBJECT ACCOUNT 8**)

cmarison (Facebook ID 28501000) (**SUBJECT ACCOUNT 9**)

(the "Accounts") that are stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered at 1601 Willow Road in Menlo Park, California.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 51
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## ATTACHMENT B-3

### Particular Things to be Seized

**I.  Information to be disclosed by Facebook, Inc.:**

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Facebook, Inc. ("Facebook"), including any data, messages, records, files, logs, or information that has been deleted but is still available to Facebook, or has been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Facebook is required to disclose the following information to the government for each account or identifier listed in Attachment A-3, from June 2018 to the present:

a.      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b.      All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c.      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

d.      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e.      All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 52
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    hardware model, operating system version, unique device identifiers, mobile network

2    information, and user agent string;

3         f.      All other records and contents of communications and messages made or

4    received by the user, including all Messenger activity, private messages, chat history,

5    video and voice calling history, and pending "Friend" requests;

6         g.      All "check ins" and other location information;

7         h.      All IP logs, including all records of the IP addresses that logged into the

8    account;

9         i.      All records of the account's usage of the "Like" feature, including all

10   Facebook posts and all non-Facebook webpages and content that the user has "liked";

11        j.      All information about the Facebook pages that the account is or was a "fan"

12   of;

13        k.      All past and present lists of friends created by the account;

14        l.      All records of Facebook searches performed by the account;

15        m.      All information about the user's access and use of Facebook Marketplace;

16        n.      The types of service utilized by the user;

17        o.      The length of service (including start date) and the means and source of any

18   payments associated with the service (including any credit card or bank account number);

19        p.      All privacy settings and other account settings, including privacy settings

20   for individual Facebook posts and activities, and all records showing which Facebook

21   users have been blocked by the account;

22        q.      All records pertaining to communications between Facebook and any

23   person regarding the user or the user's Facebook account, including contacts with support

24   services and records of actions taken;

25        r.      **All Facebook payment data**, including funds sent or received by the user.

26        Facebook is hereby ordered to disclose the above information to the government

27   within **14 days** of service of this warrant.

28

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 53
USAO# 2020R00187

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence and instrumentalities of violations of Title 18, United States Code, Section 1958 (Murder for Hire), those violations occurring between June 2018 and the present, for each of the Accounts listed on Attachment A-3, including the following:

a.     any information related to J.M.'s relationship with FIGUEROA, including communications between the two, plans to meet, and photographs of FIGUEROA and J.M. (together or held by or sent to the other);

b.     any information related to romantic feelings between J.M. and FIGUEROA, desire to remain a couple, or desire to break up or end their affair;

c.     any information related to FIGUEROA's desire to have J.M. end his marriage or to marry or solely be romantically involved with FIGUEROA.

d.     any information related to J.M.'s relationship with VICTIM, including communications regarding divorce, separation, or illness, or evidence that J.M. was unhappy in his marriage or sough to murder VICTIM;

e.     any information related to a plan to solicit murder, including by accessing websites or contacting individuals to solicit murder;

f.     any information related to J.M.'s or FIGUEROA's attendance at a Landmark course or FIGUEROA's attempts to visit or actual visits to VICTIM's house;

g.     any information related to payments made by J.M. to FIGUEROA;

h.     any information related to FIGUEROA's transfer, purchase, sale, or disposition of Bitcoin or other cryptocurrency;

i.     any information related to J.M.'s or FIGUEROA's assets, including their bank records, checks, credit card bills, account information, and other financial records, to include life insurance policies.

j.     any information related to use of the dark web, including use or downloading of a Tor browser;

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 54
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

k.      any information related to J.M.'s statements to FIGUEROA regarding VICTIM;

l.      any information related to efforts to delete browsing history or undertake other acts to remain anonymous online, including by accessing VPNs or creating multiple email accounts in a short time frame;

m.      any information related to the creation of a fake Facebook account to contact VICTIM or fake email accounts to use in furtherance of the solicitation for murder;

n.      any information related to prior attempts to harm or threaten VICTIM, or to reveal J.M.'s and FIGUEROA's affair;

o.      any information consisting of, referring to, or reflecting use of cryptocurrency, including cryptocurrency client software, cryptocurrency wallet files, and related private encryption keys, seed phrases, or other passwords;

p.      any information consisting of, referring to, or reflecting use of encryption or digital signature software, such as PGP encryption, and related public and private encryption keys;

q.      any information related to cryptocurrency applications and wallets, to include information regarding current account balance and transaction history, *i.e.*, date, time, amount, an address of the sender/recipient of a cryptocurrency transaction maintained in such wallets;

r.      any information reflecting cryptocurrencies, including web history, and documents showing the location, source, and timing of acquisition of any cryptocurrencies, to include wallets, wallet addresses, and seed phrases; and

s.      Evidence that serves to identify any person who uses or accesses the Accounts or who exercises in any way any dominion or control over the Accounts;

t.      Evidence that may identify the aliases names, online user names, "handles" and/or "nics" of those who exercise in any way any dominion or control over

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 55
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  the specified Accounts as well as records or information that may reveal the true
2  identities of these individuals;

3  　　　　u.　　Other log records, including IP address captures, associated with the
4  specified Accounts;

5  　　　　v.　　Subscriber records associated with the specified Accounts, including
6  1) names, email addresses, and screen names; 2) physical addresses; 3) records of session
7  times and durations; 4) length of service (including start date) and types of services
8  utilized; 5) telephone or instrument number or other subscriber number or identity,
9  Including any temporarily assigned network address such as IP address, media access
10 card addresses, or any other unique device identifiers recorded by internet service
11 provider in relation to the account; 6) account log files (login IP address, account
12 activation IP addresses, and IP address history); 7) detailed billing records/logs; 8) means
13 and source of payment; and 9) lists of all related accounts;

14 　　　　w.　　Records of communications between the internet service provider
15 and any person purporting to be the account holder about issues relating to the Accounts,
16 such as technical problems, billing inquiries, or complaints from other users about the
17 specified Accounts.  This to include records of contacts between the subscriber and the
18 provider's support services, as well as records of any actions taken by the provider or
19 subscriber as a result of the communications.

20 　　　　x.　　Information identifying accounts that are linked or associated with
21 the Accounts.

22

23 　　　This warrant authorizes a review of electronically stored information,
24 communications, other records and information disclosed pursuant to this warrant in
25 order to locate evidence, fruits, and instrumentalities described in this warrant.  The
26 review of this electronic data may be conducted by any government personnel assisting in
27 the investigation, who may include, in addition to law enforcement officers and agents,
28 attorneys for the government, attorney support staff, and technical experts.  Pursuant to

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 56
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 57
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT**
**TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of _____. The attached records consist of _____ [GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]. I further state that:

a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____, and they were made by _____ as a regular practice; and

b.    such records were generated by _____'s electronic process or system that produces an accurate result, to wit:

1.    the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

2.    the process or system is regularly verified by _____, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

Date        Signature

AFFIDAVIT OF SPECIAL AGENT KLEINOSKY- 58
USAO# 2020R00187

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970